[Civ. No. 22164. Second Dist., Div. One. July 8, 1957.]

H. H. ARMISTEAD, Respondent, v. CITY OF LOS AN-
GELES et al., Appellants.

320

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, and C. A. Carlson, Deputy City Attorney, for Appellants.

Dunlap, Holmes, Ross & Woodson and Glenn H. Cutler for Respondent.

J. Marion Wright and Owen E. Kupfer as Amici Curiae on behalf of Respondent.

DRAPEAU, J. pro tem.* — Plaintiff owns a three-story building at 525 Stanford Avenue in the city of Los Angeles. It was built before 1905, with wooden framing and siding. Originally it was a 33-room hotel. It is now an apartment hotel. It is located in Fire District Number 1 of the city. Lot and building are valued at about $25,000.

*Assigned by Chairman of Judicial Council.

In the opinion of the city authorities it is a decrepit, unsafe, and dangerous old building, with many defects, i.e.: Damaged by fire twice, with fire damage unrepaired. Abuts a brick building on an adjoining lot, with industrial welding and automobile parking on other adjoining lots. Inadequate fire-resistive construction throughout. Interior construction throughout, dangerous in the event of fire. No water-closets, baths, or lavatories in the apartments. Overloaded fuse boxes and substandard electrical fixtures. A definite fire hazard.

Some of the statements critical of the building seem to be a little far-fetched. For example, it is said, "The water closets are not marked to designate the sex of the users." And filth and garbage in and about a building do not necessarily require its destruction.

The Board of Building and Safety Commissioners of the City of Los Angeles declared the building a nuisance, and ordered it vacated and demolished, at the expense of the owner. This was done under asserted powers of the city in its charter and municipal code, and in the California Health and Safety Code.

A hearing was held by an examiner appointed by the board. A reporter's transcript of what took place at that hearing was considered by the board, together with recommendations by the examiner. This is the principal basis upon which the order of demolition was made.

Plaintiff appealed to the superior court for a writ of mandate. The case was submitted upon the pleadings, the reporter's transcript of the examiner's hearing, his recommendations, and the proceedings before the board.

Judgment was for a peremptory writ of mandate, commanding the board to set aside its order to vacate and demolish the building, and to reconsider the case. The judgment was based upon a finding that there was no substantial evidence in the record that the building is so dangerous and substandard that it cannot be reasonably repaired as permitted by the municipal code.

The city appeals from the judgment.

The examiner's hearing was held on two different days, November 10, 1955 and January 5, 1956. One member of the board was present at the first hearing, and took an active part in it. No member of the board was present at the second hearing.

Most of the "evidence" upon which the city relies is in the reporter's transcript of the first hearing.

At this hearing the owner of the building attempted to represent himself, with the usual resulting confusion and misunderstanding. He was a real estate man, and it looks like he thought if he talked long enough he might persuade the city to allow him to repair his building. In any event, nobody paid much attention to the traditional rules of evidence in this hearing.

First, the examiner admitted in evidence a report of the building department, Exhibit A. He said it was admitted because it was "an official report of the Department of Building and Safety." No one testified to the truth of any of the facts in this document.

Next, the examiner admitted in evidence a report of the health department, Exhibit B, for the same reason. No one testified to the truth of any of the facts in this report.

Next, the examiner admitted in evidence, and read into the record, Exhibit C, a report of the fire department. No one testified to the truth of any of the facts in that report.

Next, the examiner admitted in evidence 12 photographs and the floor plan of the building. No one testified to any foundation for the admission of these exhibits. The examiner did ask the owner if they fairly represented the condition of the building. The answer of the owner was, "Except for four, sir."

The city's case was presented by a building inspector. In conclusion he read into the record "a summary of the conditions that exist and which combine to cause this to be a dangerous and substandard residential building and a nuisance." He finally said, "Mr. Examiner, that concludes the Department's statement of facts to substantiate the opinion that this is a substandard residential building, an extreme fire hazard, a dangerous building and a nuisance."

No one testified to the truth of this summary. And the items in it are mostly legal conclusions anyway.

At the examiner's second hearing on January 5, 1956, the owner had a lawyer who tried his case.

A consulting structural engineer testified for the owner. This witness was sworn and examined in a proper legal way. His qualifications as an expert were proved. He had made a critical examination of the building, and was familiar with the city's reasons for its contention that it should be demol-

ished. He was cross-examined by another city employee, a structural engineer who had been sworn as a witness.

This expert witness for the owner testified that in his opinion the building could be repaired in conformity with the requirements of the municipal code; that it was not such a nuisance as to require demolition; and that in its structural features it was in 97 per cent of its new condition, and in its non-structural features it was in 92 per cent of its new condition. His reasons are sufficient to support his opinion.

The municipal code provides that the standard for an order of demolition is whether the building can be reasonably repaired or not, and if there is proof that the repairs will cost more than 50 per cent of the value of the building an order to demolish is proper.

At this second hearing a question arose as to the admissibility of a report of a second inspection of the building. Objection was made to reading this report into the record, to which the examiner replied:

"Under the ordinance, Mr. Holmes, we admit these as evidence inasmuch as they are public records of the Department of Building and Safety."

The inspector who prepared the report testified, under oath, as to further deterioration of the building since the first hearing. Then he said conditions were substantially the same as in the inspector's report received in evidence on the first hearing. Then on cross-examination he said that these conditions could be repaired under a proper permit.

So much for the facts; now we come to the law.

■ In reviewing orders or decisions of administrative tribunals the courts of this state are charged with the duty to ascertain if there was a fair trial, and if such orders or decisions are supported by substantial evidence, in the light of the whole record. (Code Civ. Proc., § 1094.5; *Thompson* v. *City of Long Beach,* 41 Cal.2d 235 [259 P.2d 649].)

■ An adjudicating administrative tribunal may use a procedure by which evidence is taken by an examiner, and sifted and analyzed by subordinates. (*Lumbermen's Mut. Cas. Co.* v. *Industrial Acc. Com.,* 29 Cal.2d 492 [175 P.2d 823].)

But this, like every other legislative, executive, or judicial power, is subject to article I, section 13 of our California Constitution. That section provides that no person shall be deprived of property without due process of law.

324

■ And an order of an administrative board based upon incompetent hearsay evidence contravenes due process and cannot stand. (*Kinney* v. *Sacramento City Emp. Retirement System*, 77 Cal.App.2d 779, 782 [176 P.2d 775].)

■ Also, in examining the record of an administrative board nothing may be treated as evidence that has not been introduced as such. (*La Prade* v. *Department of Water & Power*, 27 Cal.2d 47, 51 [162 P.2d 13].)

■ Therefore, in such cases as this due process of law requires that any order of demolition of private property under the police power must be based upon competent sworn evidence that the subject property falls within the legal concept of a nuisance (see *Eaton* v. *Klimm*, 217 Cal. 362 [18 P.2d 678]; *Jones* v. *City of Los Angeles*, 211 Cal. 304 [295 P. 14]; *Trans-Oceanic Oil Corp.* v. *Santa Barbara*, 85 Cal.App. 2d 776 [194 P.2d 148]; *McQueen* v. *Phelan*, 4 Cal.App. 695 [88 P. 1099]), and that in fairness and in justice there is no other way reasonably to correct the nuisance. (*Echave* v. *City of Grand Junction*, 118 Colo. 165 [193 P.2d 277, 280].)

Tried by this measure the judgment of the superior court in this case is supported by the facts and the findings.

■ In a helpful brief filed by amici curiae attention is directed to an editorial summary of the rules in the United States in cases similar to this, digested in 14 American Law Reports 2d 73, 82:

"Although it is elementary that an owner of property has no constitutional right to maintain it as a public nuisance, it is equally elementary that he has a clear constitutional right to have it determined by due process whether in fact and law it is such a nuisance. As against this right, no ex parte declaration, however formal, by municipal authorities that it is a nuisance is final as against him.

"It is said that even at common law a city or town has power to abate a public nuisance. Usually it has statutory power, vested in its governing body, to declare and abate public nuisances. But neither at common law nor under such express power can it, by its mere declaration that specified property is a nuisance, make it one when in fact it is not."

■ Referring to the city's extended argument relative to the findings. In view of the broad general finding that there was no substantial evidence to support the board's order, the city's contention that there should have been other and additional specific findings is not well taken. Nor is there any merit to the city's argument that the findings are inconsistent,

or indefinite, or contradictory, or that they fail to support the judgment.

Having come to the conclusion stated, comment upon many other phases of this case, presented and argued in the briefs, is not necessary, except as to some that should be settled if the board decides to start over again under the police power and rehear this matter.

It is stated in the briefs that this demolition order is part of a program of the city to raze a large number of buildings in this vicinity. Reference to the vicinity is sometimes made as a "rehabilitation area"; reference to the program is sometimes made as a "slum clearance project."

There is no evidence in this particular record to support this statement.

But if this statement be true we would come perilously close to passing fair bounds of limitation of the police power. (See Mr. Justice Carter's dissent in *Ayres* v. *City Council of Los Angeles*, 34 Cal.2d 31 [207 P.2d 1, 11 A.L.R.2d 503], in which he said (at page 44): " 'While the police power is very broad in concept, it is not without restriction in relation to the taking or damaging of property. When it passes beyond proper bounds in its invasion of property rights, it in effect comes within the purview of the law of eminent domain and its exercise requires compensation.' ")

To illustrate. Suppose one buys a house, or a building like the one here in question, which at the time of purchase complies with all laws and building regulations. He considers the earning power of the property, determines that it should support him and his family, and puts his life savings into it. Or perhaps the investment is the only money for the support of a devoted husband and wife, going hand in hand down the hill of life together.

Then, like a bolt from the blue, their own city tells them that they must demolish their building or their home at their own expense. Mr. Justice Holmes in *Pennsylvania Coal Co.* v. *Mahon*, 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321], hit the nail on the head when he said (at page 326), "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

There is some argument in the briefs as to the manner of submission of the examiner's report to the board, and just what the board did in its official capacity. It would have been

better to have had the record affirmatively show that the board's decision was made after consideration of the examiner's hearing, his recommendations, and all other matters properly before it, rather than to have to rely upon a presumption that the board performed its duty.

■ A fair reading of statements of city authorities leads to the conclusion that they applied to this building the following test: That if it was not up to present-day building standards and present-day legal building requirements it was an abatable or a repairable nuisance.

While such a test may be one element in determining this question of fact, it can never be the sole controlling one. Otherwise every house and building built before enactment of the latest changes in a municipal building code would be in jeopardy, should some official opine that it ought to be repaired or demolished.

To apply this test as the only determinative that an old building is a nuisance would be tantamount to ordering it demolished. For repairs to old buildings under present-day building standards and legal requirements generally would be economically unsound, and would in most cases exceed the 50 per cent limitation in the municipal code—assuming that that limitation is not contrary to due process. ■ And the fact standing alone that a building within a fire district is of wooden construction will not justify an order of demolition by a city. (*Liebman* v. *Richmond,* 103 Cal.App. 354 [284 P. 731].)

The judgment is affirmed.

White, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied August 6, 1957, and appellants' petition for a hearing by the Supreme Court was denied September 4, 1957.