[No. B102861. Second Dist., Div. Two. July 9, 1997.]

E.W.A.P., INC., Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Albert D. Sanchez and Roger Jon Diamond for Plaintiff and Appellant.

James K. Hahn, City Attorney, Claudia McGee Henry and Anthony Saul Alperin, Assistant City Attorneys, Jeri L. Burge and P. Nelson King, Deputy City Attorneys, for Defendants and Respondents.

**OPINION**

**NOTT, J.**—Appellant E.W.A.P., Inc. (also known as Erotic Words/Pictures, Inc.), appeals from the trial court's denial of its petition for writ of mandate. The primary question presented by this case is whether the application of a municipal ordinance designed to abate nuisances was improperly enforced against an adult bookstore. We hold that it was not, and affirm the judgment.

### CONTENTIONS

Appellant contends that (1) the trial court erred in deciding that Los Angeles Municipal Code (LAMC) chapter I, article 2, section 12.21A-15 is

constitutional; (2) it was denied a fair trial in the administrative proceedings due to lack of sworn testimony, denial of cross-examination, and admission of legally incompetent evidence; (3) the trial court erred in not applying the independent judgment test to judicial review of the administrative decision; (4) the findings of the associate zoning administrator and the board of zoning appeals are not supported under the independent judgment or the substantial evidence test; and (5) the board of zoning appeals erred in further reducing appellant's hours of operation.

FACTS AND PROCEDURAL BACKGROUND

Appellant has owned and operated Le Sex Shoppe adult bookstore in the Canoga Park area of the City of Los Angeles since 1972. Appellant sells and exhibits adult books, magazines, periodicals, novelties, and videos, and maintains coin-operated adult video viewing booths. From 1972 until October 24, 1994, Le Sex Shoppe was open 24 hours a day. Other businesses in the area, including a clock repair shop, antique shop and an auto supply store, typically close between 5 p.m. and 7 p.m. One restaurant is open until 10 p.m.

In March 1987, appellant entered into an agreement subject to several operating conditions with respondent, the City of Los Angeles (City), in order to prevent abatement proceedings against the property. These conditions included increasing outdoor lighting, hiring a uniformed guard, and posting a sign reading: "The management of this store is cooperating with the Los Angeles Police Department in an effort to end lewd conduct. This activity has resulted in numerous arrests here. If you engage in public masturbation, exhibition, oral copulation or other sexual encounters inside or outside this store, you will be ejected or subject to arrest."

In March 1989, appellant and respondent stipulated to a preliminary injunction requiring additional conditions for operating the business.

In November 1989, Councilperson Joy Picus sent a letter to the department of transportation requesting "No Cruising" and "No Parking/Stopping" signs in the alley behind the shop in response to citizen complaints regarding lewd conduct by male homosexuals.

In June 1990, in response to a formal complaint sent to the city planning department, associate zoning administrator Jon Perica requested voluntary conditions of operation to avoid revocation of appellant's conditional use permit.

In May 1994, Captain Valentino P. Paniccia, commanding officer West Valley area, sent a letter to Robert Jonovich, chief zoning administrator,

requesting revocation of appellant's conditional use permit because the voluntary agreements were ineffective in curbing the lewd conduct, public urination, solicitation and harassment of residents.

In August 1994, the first administrative hearing was held before associate zoning administrator John Parker (the AZA).

The AZA reported that 14 persons were present at the public hearing, and that 6 of them (including representatives from the police department and Councilperson Laura Chick's office) spoke in support of imposing additional conditions. A representative of Le Sex Shoppe spoke in favor of some additional conditions. Five letters were received in support of imposing additional conditions. Subsequent to the hearing, letters were received from both the police department and the Le Sex Shoppe attorney proposing conditions of operation.

The AZA considered evidence, including an arrest summary from 1992 to 1994, of lewd conduct arrests associated with the Le Sex Shoppe. In 1994 (year to date), there were 17 arrests; in 1993, there were 58; in 1992, there were 42. Seventy-two of the one hundred seventeen arrests were for lewd conduct (including masturbation inside the premises, solicitation for lewd acts of a homosexual nature), thirty-two were for continual cruising, two were for drinking in public, and two were arrests for outstanding warrants. The AZA considered evidence showing that during the last two and one-half years, one hundred seventeen arrests had been made which are directly attributable to the presence of Le Sex Shoppe; thirteen additional arrests have occurred in the last three months, three for masturbation within video booths; there had been numerous public complaints to the police department within the same time periods; police efforts to date had been unsuccessful, consuming substantial amounts of time with little success; and the imposition of prior conditions (including security guards and gating) has had little effect.

The AZA found that a library used by children is located within one block of Le Sex Shoppe. Moreover, within the area are a community center, used by older people and children, and apartments. Arrestees stated that they were in the area because Le Sex Shoppe drew them as a location known as a homosexual cruising and solicitation point. The problem is not better now than it was 10 years ago, and appellant has not been responsive to recent concerns, including 3 arrests made within the store for lewd conduct. Even a security guard employed by appellant was caught soliciting lewd acts. The AZA imposed 20 operating conditions including requiring closure from 2 a.m. to 6 a.m.

The AZA found that the property is a public nuisance, as established in LAMC section 12.21A-15, and that, among other things, its operation has:

adversely impacted nearby commercial and residential uses; acted as a magnet for illegal activities, resulting in excessive police service; resulted in harassment of passersby, prostitution, public urination, loitering, cruising, littering, traffic violations, lewd conduct, and police detentions and arrests.

Appellant then appealed the decision to the board of zoning appeals (BZA). The BZA adopted most of the AZA's recommendations, but further reduced the hours of operation to 9 a.m. to 10 p.m. Appellant appealed to the Los Angeles City Council (the Council). On February 28, 1995, the Council considered the matter and adopted the BZA's findings and corrective conditions as recommended by the planning and land use management committee. The Council denied appellant's appeal and sustained the determination of the BZA without modification. The Council's action was approved by the mayor on March 2, 1995.

On March 6, 1995, appellant filed its complaint for injunctive and declaratory relief, and petition for administrative mandamus. On March 9, 1995, appellant filed its notice of motion for preliminary injunction and stay of administrative decision. On May 8, 1995, the trial court issued a preliminary injunction enjoining any enforcement of LAMC section 12.21A-15 against appellant for the operation of the bookstore. On February 22, 1996, appellant filed its notice of motion for peremptory writ of mandate. The trial court denied the peremptory writ, finding as a matter of law that LAMC section 12.21A-15 is not unconstitutional. The court dissolved the preliminary injunction.

Appellant has complied with all conditions with the exception of the restriction of hours to 9 a.m. to 10 p.m.

This appeal followed.

### DISCUSSION

1. *Whether the trial court erred in finding that LAMC section 12.21 A-15 is constitutional.*

a. *The ordinance's impact on First Amendment rights is indirect.*

■ The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . ." and is applicable to the states by the due process clause of the Fourteenth Amendment. (*Young v. American Mini Theatres* (1976) 427 U.S. 50, 52, fn. 1 [96 S.Ct. 2440, 2443, 49 L.Ed.2d 310].)

As respondent points out, the impact of the LAMC ordinance on First Amendment rights is indirect. In *Arcara* v. *Cloud Books, Inc.* (1986) 478 U.S. 697, 707 [106 S.Ct. 3172, 3177-3178, 92 L.Ed.2d 568], a New York public health law allowed the city to enjoin and abate places of prostitution, lewdness, and assignation as public health nuisances for a period of one year. In that case, an undercover police officer observed instances of masturbation, fondling, and fellatio by patrons on the premises of an adult bookstore, all within the observation of the proprietor. On four occasions the officer was solicited by men who offered to perform sexual acts in exchange for money. The United States Supreme Court found that ". . . the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which [books are sold]." (*Id.*, at p. 706 [106 S.Ct. at p. 3177].) The court found that the sexual activity manifested absolutely no element of protected expression. That is, "First Amendment values may not be invoked by merely linking the words 'sex' and 'books.' " (*Id.*, at p. 705 [106 S.Ct. at p. 3176].) The court disregarded the bookstore's argument that the closure of the store would impermissibly burden its First Amendment protected bookselling activities, because the bookstore could sell its materials at another location. (*Ibid.*)

Similarly here, the ordinance impacts directly on nuisance activities and only indirectly upon appellant's First Amendment rights. That is, the ordinance at issue targets nuisance activities including "disturbances of the peace, illegal drug activity, public drunkenness, drinking in public, harassment of passersby, gambling, prostitution, sale of stolen goods, public urination, theft, assaults, batteries, acts of vandalism, loitering, excessive littering, illegal parking, loud noises (particularly in late night or early morning hours), traffic violations, curfew violations, lewd conduct or police detentions and arrests . . . ." (LAMC, § 12.21A-15(a)(4).) Thus, under *Arcara*, the conditions imposed by the AZA and BZA do not implicate First Amendment rights through the enforcement of the City's police powers in regulating land use. (See *Adult Video Ass'n* v. *Barr* (9th Cir. 1992) 960 F.2d 781, 790 [Rico (Racketeer Influenced and Corrupt Organizations Act) provisions permitting pretrial preservation of assets for forfeiture was not unconstitutional because unlawful commercial conduct rather than speech was at issue].)

b. *Appellant does not have standing to assert the rights of third parties in the abstract, against an ordinance which is not vague as to itself.*

Even if we proceed to analyze whether the ordinance is vague, we conclude that appellant lacks standing to assert the rights of third parties.

Zoning laws can be used to regulate businesses which implicate the First Amendment. In *Young* v. *American Mini Theatres, supra*, 427 U.S. 50, the United States Supreme Court analyzed zoning regulations enacted by the City of Detroit which made it unlawful for adult book stores and adult theaters to be established within 500 feet of any residential area or 1,000 feet of any 2 other "regulated uses." Those "regulated uses" included cabarets, hotels, taxi dance halls and pool halls. (*Id.*, at p. 52, fn. 2 [96 S.Ct. at p. 2444].)

The plaintiffs attacked the ordinance, arguing that the distinction applied to adult fare as " 'characterized by [their] emphasis on matter depicting, describing or relating to "Specified Sexual Activities" or "Specified Anatomical Areas," ' " (427 U.S. at p. 53 [96 S.Ct. at p. 2444]) was vague because it was unclear how much of the described activity may be permissible before fitting within that category. The court found that the plaintiffs lacked standing to raise that argument in the abstract because the ordinance clearly applied to the plaintiffs, which were establishments that proposed to offer adult fare on a regular basis. (*Id.*, at p. 59 [96 S.Ct. at pp. 2446-2447].) That is, a litigant cannot assert the rights of third parties "if the statute's deterrent effect on legitimate expression is not 'both real and substantial,' and if the statute is 'readily subject to a narrowing construction by the state courts.' " (*Id.*, at p. 60 [96 S.Ct. at p. 2447].) The court was not persuaded that the ordinance would deter First Amendment protected speech, and it believed there was "no reason why the ordinances are not 'readily subject to a narrowing construction by the state courts.' " (*Id.*, at p. 61 [96 S.Ct. at p. 2448].)

Under LAMC section 12.21A-15(a), the zoning administrator may modify or discontinue a commercial or industrial use if he or she finds that the use: "(1) Adversely impacts nearby agricultural, residential, or commercial uses; and [¶] (2) Jeopardizes or endangers the public health or safety of persons residing or working on the premises or in the surrounding area; or [¶] (3) Constitutes a public nuisance; or [¶] (4) Has resulted in repeated nuisance activities including but not limited to disturbances of the peace, illegal drug activity, public drunkenness, drinking in public, harassment of passersby, gambling, prostitution, sale of stolen goods, public urination, theft, assaults, batteries, acts of vandalism, loitering, excessive littering, illegal parking, loud noises (particularly in late night or early morning hours), traffic violations, curfew violations, lewd conduct or police detentions and arrests; or

[¶] (5) Violates any provision of this chapter or any other city, state, or federal regulation, ordinance or statute."[1]

---

[1]LAMC section 12.21A-15 further provides:

"(b) . . . The Zoning Administrator may give notice to the record owner and the lessee of the real property affected to appear at a public hearing at a time and place fixed by the Administrator, and show cause why the use, building, or structure should not be modified, discontinued, or removed as the case may be. A written notice shall be mailed not less than 24 days prior to the date of hearing to the owner and lessee of the property involved, and to the owners of all property within and outside of the City that is within 500 feet of the exterior boundaries of the property involved, using for the purpose of notification the last known name and address of such owners as shown upon the records of the City Clerk or, in the case of property outside of the City, the records of the County Assessor. If all property within the 500-foot radius is under the same ownership as the property involved in the proceeding, then the owners or all property which adjoins said ownership, or is separated only by a street, alley, public right-of-way or other easement, shall also be notified as provided herein. [¶] Written notice shall also be mailed to residential, commercial, and industrial occupants of all property within 500 feet of the exterior boundaries of the property involved. This requirement can be met by mailing such notice to 'occupant.' If this notice provision will not result in notice being given to at least 20 different owners of at least 20 different parcels of property other than the subject property, and at least 50 different persons, then the 500-foot radius for notification shall be increased in increments of 50 feet until the required number of persons, and parcels of property are encompassed within the expanded area. Notification shall then be given to all property owners and occupants within such area. [¶] After such notice and hearing, the Administrator may require the modification or discontinuance, or removal of the subject use building or structure. As part of any such action, the Administrator may impose such conditions as the Administrator deems appropriate, including those necessary to protect the best interest of the surrounding property or neighborhood, to eliminate, lessen, or prevent any detrimental effect thereon, or assure compliance with other applicable provisions of law. Conditions imposed may include the establishment of amortization schedules, and may affect the establishment, maintenance, or operation of the subject commercial or industrial use and any related uses, buildings or structures. [¶] Any such action will be supported by written findings, including a finding that it does not impair the constitutional rights of any person. However, the Administrator may require that a use be discontinued or a building removed only upon finding that (i) prior governmental efforts to cause the owner or lessee to eliminate the problems associated with the premises have failed (examples include formal action by the Police Department, Department of Building and Safety, the Administrator or the Planning Department); and (ii) that the owner or lessee has failed to demonstrate, to the satisfaction of the Administrator, the willingness and ability to eliminate the problems associated with the premises. [¶] An appeal from the action of the Administrator may be taken to the Board of Zoning Appeals and to the City Council in the same manner as prescribed in Section 12.28 for conditional use appeals. However, only the Administrator may require the discontinuance of a use. Further, if it is established to the satisfaction of the Board or Council that the proposed action impairs the constitutional rights of any person, then it shall modify the proposed action accordingly.

"(c) . . . It shall be unlawful to violate or fail to comply with any requirement or condition imposed by final action of a Zoning Administrator, Board, or Council pursuant to this subsection. Such violation or failure to comply shall constitute a violation of this chapter and shall be subject to the same penalties as any other violation of this chapter. In the event of a violation of an order of discontinuance or removal, the Department of Building and Safety is authorized to revoke the Certificate of Occupancy for the property in violation."

Appellant attacks the ordinance on the grounds that it is vague, uncertain and overbroad. ■ Typically, "[a]lthough the activity of selling or distributing books is not exempt from reasonable regulation, it is entitled to First Amendment protection [Citations.] Statutes which authorize public officials to license conduct protected by the First Amendment must set forth definite, objective guidelines for the issuance of such licenses." (*Perrine* v. *Municipal Court* (1971) 5 Cal.3d 656, 661 [97 Cal.Rptr. 320, 488 P.2d 648].)

Under Government Code section 65901, the legislative body grants to the zoning administrator the power to hear applications for conditional uses and to exercise any other powers granted by local ordinance. The standards by which the administrative body operates can be vague, due to the " ' " 'need of government in large urban areas to delegate broad discretionary power to administrative bodies if the community's zoning business is to be done without paralyzing the legislative process.' " ' " (*Rodriguez* v. *Solis* (1991) 1 Cal.App.4th 495, 509 [2 Cal.Rptr.2d 50].) However, when zoning restrictions implicate First Amendment rights, the courts require greater specificity in the ordinance "to avoid undue administrative discretion impinging on the owner's rights." (*Id.*, at p. 508.)

Appellant cites cases which, unlike the instant case, involve prior restraints or permit revocation. In *Burton* v. *Municipal Court* (1968) 68 Cal.2d 684 [68 Cal.Rptr. 721, 441 P.2d 281], the ordinance at issue empowered the board of police commissioners to deny a permit to theaters if the board of zoning appeals found that, among other things, the business has been or is a public nuisance. A nuisance is defined as: "Anything which is injurious to health, . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any . . . public park, square, street, or highway, is a nuisance." (Civ. Code, § 3479.) Civil Code section 3480 defines a public nuisance as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons . . . ." The court found those provisions to be vague; however, its concern was not whether particular activity had been properly defined as a nuisance, but whether the police board had been vested with an overabundance of discretion.

Appellant, in attempting to draw an analogy between *Burton* and this case, cites to language in LAMC section 12.21A-15 which allows the zoning administrator to modify a use which constitutes a public nuisance or "[h]as resulted in repeated nuisance activities including but not limited to disturbances of the peace, illegal drug activity, public drunkenness, drinking in public, harassment of passersby, gambling, prostitution, sale of stolen goods,

public urination, theft, assaults, batteries, acts of vandalism, loitering, excessive littering, illegal parking, loud noises (particularly in late night or early morning hours), traffic violations, curfew violations, lewd conduct or police detentions and arrests . . . ." (LAMC, § 12.21A-15(a)(4).)

▓ We do not agree with appellant that the zoning administrator has been granted unfettered discretion, since nuisance activities are specifically defined in LAMC section 12.21A-15 and it is clear that the precise conduct which is proscribed by the ordinance occurred here. ▓ "It is the rule that a litigant whose conduct is precisely proscribed by a statute has no standing to argue that the law is vague as applied to others." (*City of Vallejo* v. *Adult Books* (1985) 167 Cal.App.3d 1169, 1175 [213 Cal.Rptr. 143].) "The First Amendment standing exception applies only if the statute's deterrent effect on legitimate expression is ' "both real and substantial" ' and if the statute is not ' "readily subject to a narrowing construction by the state courts." ' " (*Ibid.*, citing *Young* v. *American Mini Theatres*, *supra*, 427 U.S. 50, 60 [96 S.Ct. 2440, 2447].)

▓ The evidence shows that the AZA considered extensive testimony and letters in finding that during the last two and one-half years there have been one hundred seventeen arrests made which are directly attributable to the presence of Le Sex Shoppe. According to the AZA, thirteen additional arrests had occurred in the last three months, of which three were for masturbation inside video booths. The arrests included solicitation for lewd acts of a homosexual nature. The evidence also showed that numerous public complaints had been made to the police department, and that police efforts consumed substantial amounts of time with little success. The AZA considered evidence showing that the imposition of prior conditions (including security guards and gating) had little effect.

There is no question that the activities surrounding the establishment of Le Sex Shoppe fall within the ambit of the ordinance. The ordinance is not vague to appellant, and appellant cannot argue against the ordinance in the abstract. (*Young* v. *American Mini Theatres*, *supra*, 427 U.S. 50, 59 [96 S.Ct. 2440, 2446-2447].) Nor do we find that there is an exception to the standing requirement. The statute's deterrent effect on legitimate expression is not " 'both real and substantial' " (*id.*, at p. 60 [96 S.Ct. at p. 2447]) and the statute is " 'readily subject to a narrowing construction by the state courts.' " (*Id.*, at p. 61 [96 S.Ct. at p. 2448].) That is, the appellant's concern with the broadness of the definition of "public nuisance" is obviated by the specific examples of nuisance activities. Nor do we believe that the phrase "not limited to" gives the AZA unlimited discretion when read in conjunction with the entire ordinance.

Appellant's citation to *Barry* v. *City of Oceanside* (1980) 107 Cal.App.3d 257 [165 Cal.Rptr. 697] also does not advance its cause. In that case, the subject ordinance authorized the license inspector to revoke a business license "whenever the public health, welfare, or safety is harmed or threatened due to . . . the manner in which the business is operated." (*Id.*, at p. 260, citing Oceanside City Code section 15.3(18).) City officials revoked the license of an adult book store after 25 persons were arrested for masturbating on the premises. The court applied a strict scrutiny analysis to the licensing ordinance, finding that the ordinance was vague, overbroad, and a prior restraint, and that nothing suggested the owners of the bookstore sought the response their patrons exhibited. (107 Cal.App.3d at pp. 261-263.)

*Barry* is inapposite. The phrase "whenever the public health, welfare, or safety is harmed or threatened . . ." (107 Cal.App.3d at p. 260) is amorphous and vests almost complete discretion in the license inspector, whereas in the instant case specific examples of "repeated nuisance activities" are given. In *Barry*, the court noted that after the bookstore posted notices warning patrons not to engage in lewd activity, suggesting it would lead to arrest and convictions, no further arrests were made. The same cannot be said here. Indeed, *Barry* cites *Burton* in stating that a nuisance can be eliminated by indictment, information or an action for abatement. (*Id.*, at p. 264.)

Further, we do not find appellant's citations to the following authorities persuasive. Each involves both prior restraints and vague guidelines, with none of the specificity which the instant ordinance exhibits: *City of Imperial Beach* v. *Escott* (1981) 115 Cal.App.3d 134, 137-138 [171 Cal.Rptr. 197] (ordinance giving as issuance criteria: " 'A. That the proposed use at the particular location is necessary or desirable to provide a service or facility which will contribute to the general well-being of the neighborhood or community; [¶] B. That such use will not, under the circumstances of the particular case, be detrimental to the health, safety, or general welfare of persons residing or working in the vicinity, or injurious to property or improvements in the vicinity.' "); *Ebel* v. *City of Garden Grove* (1981) 120 Cal.App.3d 399, 405-406 [176 Cal.Rptr. 312] (ordinance setting out the criteria for issuance of a conditional use permit stated: " 'The purpose of a Conditional Use Permit shall be: [¶] (a) To assure that the degree of compatibility made the purpose of this Chapter shall be maintained with respect to the particular use on the particular site and in consideration of other existing and potential uses and improvements within the general area in which such is proposed to be located; and [¶] (b) To recognize and compensate for variations and degree of technological processes and equipment as related to the factors of noise, smoke, dust, fumes, vibration, odors,

and hazard or public need.' ''); and *Smith* v. *County of Los Angeles* (1994) 24 Cal.App.4th 990, 1001 [29 Cal.Rptr.2d 680] (criteria for issuance of a conditional use permit: '' '1. The requested use at the proposed location will not adversely affect the use of a church, temple or other place used exclusively for religious worship, school, park, playground or similar use within a 500-foot radius; and [¶] 2. The requested use at the proposed location is sufficiently buffered in relation to residentially zoned areas within the immediate vicinity so as not to adversely affect said areas; and [¶] 3. The exterior appearance of the structure will not be inconsistent with the external appearance of commercial structures already constructed or under construction within the immediate neighborhood so as to cause blight, deterioration, or substantially diminish or impair property values within the neighborhood.' '').

We conclude that the ordinance is not vague as applied to appellant, and that appellant cannot attack the statute on grounds not applicable to itself.

### 2. *Whether appellant was denied a fair trial*

██ Division One of this district recently held that sworn testimony and cross-examination of witnesses was unnecessary to safeguard due process rights in a nuisance abatement proceeding. In *Mohilef* v. *Janovici* (1996) 51 Cal.App.4th 267 [58 Cal.Rptr.2d 721], the court held that nuisance abatement proceedings implicate a protected property interest, entitling plaintiffs to due process safeguards. (*Id.*, at p. 285.) The court stated that while due process requires reasonable notice and an opportunity to be heard before governmental deprivation of a significant property interest, a formal hearing, with full rights of confrontation and cross-examination, is not necessarily required. (*Id.*, at p. 286.) The court made an exhaustive study of state and federal court cases inside and outside of California to support its conclusion that the associate zoning administrator did not violate the due process clause by failing to swear in witnesses. (*Id.*, at p. 294.) Indeed, the court recognized that the "informality of the public hearings, including the lack of an oath, is an important aspect of the decisionmaking process" of an administrative agency. (*Ibid.*) Moreover, the court determined that the associate zoning administrator should be able to consider letters from residents who may be unable to attend the public hearing, without being required to observe formal rules of evidence in nuisance abatement proceedings. Otherwise, an efficient factfinding process would be transformed into "a technical cumbersome procedure, would encourage witnesses to assume the financial burden of retaining counsel in preparing their testimony (or discourage them from appearing if they cannot or do not retain counsel), and would alter the nature and functioning of the [associate zoning administrator and the board of zoning appeals] by injecting legalisms and attorneys into what is currently

a process governed by laypersons." (*Id.*, at p. 295.) Additionally, the ability of the associate zoning administrator to question witnesses, the fact that the witnesses had to state their names for the record, the levels of decisionmaking requiring a review of the record, the fact that a property owner can present his own witnesses, documents and legal argument, and the ability to seek judicial review, are all due process safeguards. (*Id.*, at p. 297.)

The court also rejected the plaintiffs' argument that the due process clause entitled them to an absolute right to cross-examine witnesses at the public hearings, balancing the fiscal and administrative burdens against the minimal value of the right of cross-examination in an administrative nuisance action. (51 Cal.App.4th at pp. 300-301.)

Appellant's citations in support of its proposition that sworn testimony is required in abatement proceedings are unavailing. Appellant cites dicta contained in *City of Costa Mesa* v. *Soffer* (1992) 11 Cal.App.4th 378, 382, footnote, 3 [13 Cal.Rptr.2d 735], which in turn relies on the dicta of *Leppo* v. *City of Petaluma* (1971) 20 Cal.App.3d 711, 718 [97 Cal.Rptr. 840]. Disregarding the dicta of *Leppo* and disagreeing with *Armistead* v. *City of Los Angeles* (1957) 152 Cal.App.2d 319 [313 P.2d 127], upon which *Leppo* relied, Division One in *Mohilef* recognized that ". . . when directly confronted with the issue, courts have rejected the notion that the due process clause requires sworn testimony in an administrative proceeding." (51 Cal.App.4th 267, 298.) Also, we are unconvinced by appellant's attempt to distinguish *Mohilef* on the basis that the property interests in *Mohilef* were less compelling than the property interests asserted by appellant here. In the *Mohilef* case, the board of zoning appeals ultimately precluded the plaintiffs from keeping any birds on its farm, even though the LAMC permitted the keeping of some birds on the property. Therefore, protected property interests were implicated.

Appellant also takes umbrage at the type of information presented before the AZA and the BZA, such as the arrest reports. The court in *Mohilef* recognized that the value of cross-examination is diminished where numerous witnesses testify to the same basic experience, such as smelling a foul odor or seeing bird feathers collecting on the ground. Similarly here, the record is replete with reports, letters and testimony as to the litter, noise, sexual activity and harassment, such that the value of cross-examination is questionable.

We conclude that appellant was not denied a fair trial by virtue of the lack of sworn testimony, the lack of cross-examination, or the quality of the evidence.

### 3. *Whether the trial court applied the correct standard of review.*

■ Under Code of Civil Procedure section 1094.5, subdivision (b), administrative orders are reviewed to determine whether there was an abuse of discretion. According to Code of Civil Procedure section 1094.5, subdivision (c): "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."

"If an administrative decision substantially affects a fundamental vested right, the trial court must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence. [Citations.] On appeal, we consider only whether the trial court's finding is supported by substantial evidence." (*Goat Hill Tavern* v. *City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1525 [8 Cal.Rptr.2d 385].)

"When a right 'has been legitimately acquired or is otherwise "vested," and when that right is of a fundamental nature from the standpoint of its economic aspect or its "effect . . . in human terms and the importance . . . . . . to the individual in the life situation," then a full and independent *judicial* review of that decision is indicated because "[t]he abrogation of the right is too important to the individual to relegate it to exclusive administrative extinction." . . .' " (*301 Ocean Ave. Corp.* v. *Santa Monica Rent Control Bd.* (1991) 228 Cal.App.3d 1548, 1556 [279 Cal.Rptr. 636], citing *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 144 [93 Cal.Rptr. 234, 481 P.2d 242], italics in original.) "Whether an administrative decision substantially affects a fundamental vested right must be decided on a case-by-case basis. [Citation.] Although no exact formula exists by which to make this determination . . . , courts are less sensitive to the preservation of purely economic interests. [Citation.]" (*301 Ocean Ave. Corp.* v. *Santa Monica Rent Control Bd., supra,* at p. 1556.) "In deciding whether a right is 'fundamental' and 'vested,' the issue in each case is whether the ' "affected right is deemed to be of sufficient significance to preclude its extinction or abridgment by a body lacking *judicial* power." [Citation.]' " (*Ibid.,* italics in original.)

■ We find that the court here correctly applied the substantial evidence test. Administrative decisions which result in restricting a property owner's return on his property, increasing the cost of doing business, or reducing profits are considered impacts on economic interests, rather than on fundamental vested rights. (See *San Marcos Mobilehome Park Owners' Assn.* v.

*City of San Marcos* (1987) 192 Cal.App.3d 1492, 1502 [238 Cal.Rptr. 290] [denial of application for rent increase merely restricts return from property; it would not force owner out of business or affect his right not to have his property taken away from him]; *Mobil Oil Corp.* v. *Superior Court* (1976) 59 Cal.App.3d 293, 305 [130 Cal.Rptr. 814] [requirement of installation of gasoline vapor recovery systems increases cost of doing business; oil companies have no fundamental and vested right to continue releasing gasoline vapors into atmosphere, nor will they be driven out of business by requirement]; *Standard Oil Co.* v. *Feldstein* (1980) 105 Cal.App.3d 590 [164 Cal.Rptr. 403] [shutdown of fourth new refinery unit due to permit violation impacted only profits].)

Here, appellant claims that the time restriction will result in a 46 percent reduction in appellant's hours of operation from its original 24-hour time period of operation. In a declaration in support of the motion for preliminary injunction, appellant's area supervisor states that appellant "currently enjoy[s] substantial patronage between the hours of 10 p.m. and 2 a.m. at night and between the hours of 7 a.m. and 9 a.m." He estimated a 25-30 percent reduction in revenue would result from the further restriction of hours. Appellant, however, has not provided factual evidence in the form of time-dated cash receipts or percentage of customers affected. Nor has he shown that business has dropped off due to voluntary compliance with the 2 a.m. to 6 a.m. proscription. Rather, appellant's declarant states that "our customers have been able to adjust to the store's closing between 2 a.m. and 7 a.m." The declaration makes the vague statement that many customers use the proscribed hours to exchange videos or make purchases on their way to work in the morning. His estimate of a reduction in business is therefore mere speculation.

Appellant's citation to *Goat Hill Tavern* v. *City of Costa Mesa, supra,* 6 Cal.App.4th 1519, does not avail it. In that case, the tavern had been in operation for over 35 years as a legal nonconforming use, and its owner had invested over $1,750,000 in its refurbishment, including improvements made at the city's request. When a temporary conditional use permit expired, the city contended that the owner lost all right to continue in business. The court found that this was a unique case because the owner's "right to continue operating an established business in which he has made a substantial investment" was impacted, and concluded that the independent judgment test applied. (*Id.,* at pp. 1529, 1530.) Although appellant cites *Goat Hill* for the proposition that the revocation of a permit requires heightened review, and that the limitation of hours in the instant case may lead to revocation, *Goat Hill* also recognizes that " '[a] compelling public necessity warranting the revocation of a use permit for a lawful business may exist where the conduct of that business constitutes a nuisance.' " (*Id.,* at p. 1530.)

Accordingly, we find that the impact of the hours restrictions, if any, on appellant's business is purely economic, and conclude that the trial court properly applied the substantial evidence test.

### 4. *Whether the findings of the AZA and the BZA were supported by the weight of evidence.*

 Appellant complains that the evidence relied upon by the AZA was based in large part upon incompetent evidence, including unreliable hearsay statements. Appellant reiterates its charges which we have addressed in part 2, that the evidence was not produced by sworn testimony, or declarations under penalty of perjury and that cross-examination was not permitted.

Appellant dismisses five letters as anecdotal and contends that the letters and statements from neighbors and business owners fail to connect alleged problems to the bookstore. We disagree with appellant's analysis. Our review of those letters[2] indicates that, in addition to parking problems, the letters specifically complain of harassment, littering, public urination, and public sexual activity connected with patrons of Le Sex Shoppe. One property owner of two buildings on the same block as Le Sex Shoppe, stated that: ". . . innocent bystanders in the parking lots and alley behind Le Sex Shoppe have been grabbed, heckled, solicited and generally intimidated by Le Sex Shoppe patrons." One letter stated that the author had "witnessed lewd conduct, public urination, littering, solicitations and on one occasion, my girlfriend had the unfortunate distinction of witnessing a naked man, [*sic*] masturbate in his car as he drove along side of her westbound on Sherman Way." The owner of About Time, a clock repair shop with a parking lot adjacent to Le Sex Shoppe, stated that Le Sex Shoppe patrons park in his lot and are very belligerent when asked to move. The proprietor of a mental health clinic, a Center for Hope and Health, described activities associated with the Le Sex Shoppe including male prostitution, cruising, littering, loitering, public urination, sexual activities in automobiles parking in the parking lot behind her building, and harassment of passersby by Le Sex Shoppe customers. Activities had been observed and confirmed as recently as August 3, 1994, by Sergeant Vlaskamp of the Los Angeles Police Department vice unit. Clients of the mental health clinic have expressed disgust, anger, and a feeling of visual assault, especially those who struggle with issues of sexual crimes which have been committed against them or

---

[2]Due to a miscommunication between this court and the court clerk, the court did not believe that the administrative record had been filed. In issuing our opinion on May 14, 1997, the court reviewed that portion of the administrative record which was contained in the clerk's transcripts. We have now reviewed the portions of the administrative record which were not contained in the clerk's transcripts, and find that the record strongly bolsters our original conclusion.

their loved ones. The proprietor of a Center for Hope and Health stated that Le Sex Shoppe is not a welcome addition to the revitalization of Canoga Park. The last letter, by Quimby Park Neighborhood Watch, complained of social and physical deterioration and declining property values.

Appellant contends that the arrest summary attached to a fact sheet submitted by the "West Valley Police Vice" did not contain details linking the crimes to appellant's business. However, the AZA's findings contained in the record indicate that "a fact sheet was completed by West Valley Vice to demonstrate the level of lewd conduct activity in and around the premises. It indicated there were a total of 21 lewd conduct related arrests during May 1990. Recommendations included restriction of business hours and the employment of a security guard. The fact sheet was forwarded, with a cover letter from Captain Mancini, Acting Commanding Officer West Valley Area, to then-City Council Field Deputy Laura Chick." The AZA makes extensive reference to testimony given by representatives of the police department, letters received from the public and the police department before and after the hearing, and testimony given by a representative of appellant.

Appellant also contends that there were no arrests in and around the bookstore from the date of the AZA's hearing to the date of the BZA's hearing. Appellant cites to the administrative record stating that "there was evidence before the City Council that there was only *one* arrest and that took place in the City-owned public parking lot." However, that statement is taken out of context. Sergeant Maren actually stated: "As recently as the 16th of January there was an arrest made behind Le Sex Shoppe in the public parking lot where an individual was naked in his car masturbating and that arrest was made by our patrol officers from the division." Moreover, Sergeant Maren also testified that since 1977, up to 943 arrests have been made in the area surrounding Le Sex Shoppe for lewd conduct. He stated that even with added security, cruising still occurs in the area; arrests have been made in the past six months; interviews with arrestees led him to believe that the situation would not change; one arrestee stated that "[t]his is the place I come to meet men, and I'm not going to stop . . ."; and one security guard told him he was quitting because the activity made him sick to his stomach. Sergeant Maren also opined that the nuisance and crime would be reduced if the hours were changed to 7 a.m. to 10 p.m.

Appellant also cites to the administrative record for the proposition that "Sergeant Vlaskamp admitted that no arrests had occurred since the AZA's hearing on August 5, 1994—three months earlier." The record contains no such statement or admission. Sergeant Vlaskamp did state that since the last hearing the West Valley vice department had been unable to work that

location because it got involved with a task force bookmaking operation and prostitution problem. Sergeant Vlaskamp also stated that the cruising and lewd activity has continued as reported to him by the security officers hired by appellant.

5. *Whether the BZA improperly relied on new evidence offered at the BZA hearing.*

According to LAMC chapter I, article 2, section 12.28A-7(b): "The Board shall base its determination only upon (i) evidence introduced at the hearing or hearings, if any, before the Zoning Administrator, on the issue, (ii) the record, findings, and determination of the Zoning Administrator, or (iii) the consideration of arguments, if any, presented to the Board orally or in writing." Moreover, LAMC section 12.28A-7(b) provides: " 'If an applicant or aggrieved person wishes to offer into the proceedings any new evidence in connection with the matter, a written summary of such evidence together with a statement as to why such evidence could not reasonably have been presented to the Zoning Administrator shall be filed with the Board. If the Board determines that such evidence could not reasonably have been presented to the Zoning Administrator and is of such a nature as might reasonably have led to a different determination by the Zoning Administrator, the Board shall remand the matter to the Zoning Administrator, who shall reopen the matter only for receipt of evidence summarized to the Board together with evidence from other parties relative thereto and within 55 days make a new order, requirement, decision, interpretation or other determination in the matter.' " (See *Mohilef* v. *Janovici, supra,* 51 Cal.App.4th 267, 309.)

Appellant urges that the BZA heard new evidence with respect to further reducing appellant's hours of operation which was not before the AZA. However, the BZA may receive new evidence; it would be impractical not to do so. (*Mohilef* v. *Janovici, supra,* 51 Cal.App.4th at p. 309.) It is true though, that the BZA may not rely on the new evidence in deciding the appeal. (*Ibid.*)

Appellant now complains in its petition for rehearing that the respondents presented an entirely new case, including testimony from a police vice officer and from a representative of the Council office, and the statements of five property owners and business people who live or work in the immediate area. However, our review of the testimony and the evidence shows that that evidence was cumulative to that received by the AZA. The parts of the administrative record to which appellant cites include testimony by the AZA before the BZA in which he explained that bookstores do not ordinarily stay

open until 2 a.m. in that area. He stated that "[m]y preference would have been, frankly, to have them close still earlier." Accordingly, appellant has not shown that the BZA was presented with "new" evidence which the AZA did not have.

Moreover, appellant itself cites repeatedly to evidence which was not before the AZA, but was submitted to the BZA or the Council, including declarations by Robert A. DePiano, Jeff Brown, and Paul Devlin, as support for its argument that no new arrests had been made from the time of the AZA hearing. Appellant apparently wants to have the opportunity to present "new" evidence, while preventing respondents from doing so.

Appellant has not shown that the BZA relied on new, rather than cumulative evidence in denying the appeal. Nor does it contend that the BZA determined that the evidence might have led to a different determination by the AZA and that therefore the BZA should have remanded the matter to the AZA. Accordingly, appellant has not persuaded us that the BZA improperly relied on new evidence.

### DISPOSITION

The judgment is affirmed.

Fukuto, Acting P. J., and Zebrowski, J., concurred.

A petition for a rehearing was denied August 7, 1997, and appellant's petition for review by the Supreme Court was denied October 1, 1997.